IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA MOORE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-4808 |
| v. | : | |
| | : | |
| HENRY M. PAULSEN, JR. and | : | |
| MARK W. EVERSON, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

Giles, J.                                                      September 15, 2008

Before the court is Defendants' Motion for Summary Judgment (Doc. No. 19), Plaintiff's

Response in opposition thereto (Doc. No. 25), and Defendants' Reply (Doc. No. 31).

Defendants' Motion for Summary Judgment is granted in part and denied in part for the reasons

that follow.

## FACTUAL ALLEGATIONS

The court recites the evidence in the light most favorable to Plaintiff.

Plaintiff Linda Moore is an employee of the Internal Revenue Service ("IRS"). She

began working for the IRS in 1998 as a part-time and full-time seasonal worker. (Defs.' Mem.,

Ex. A, Linda Moore Dep., Nov. 2, 2007 ("Moore Dep.") at 43-45.) In 2001, she was hired as a

customer service representative ("CSR") in the Practitioner Priority Service group ("PPS") at the

IRS campus on Roosevelt Boulevard in Philadelphia. (Moore Dep. at 46; Defs.' Mem., Ex. B,

Linda Moore Dep., June 27, 2006 ("Moore Dep. II") at 13.)  The PPS group is divided into

"units" or "teams" of ten to eighteen CSRs.  (Moore Dep. 63-63.)  Each unit is supervised by a

Manager who is assisted by a "Lead."  (Defs.' Mem., Ex. C, Declaration of Joann M. Brown,

Feb. 4, 2008 ("Brown Dec.") at ¶ 4.)

Plaintiff was supervised in her PPS group by Wayne Goerlich, a Manager.  (Moore Dep.

at 46, 64.)  At some time during her tenure in the PPS group, while supervised by Mr. Goerlich,

Plaintiff was moved from a full-time seasonal employee to a full-time permanent employee.

(Moore Dep. at 58.)

At the time of the events alleged in Plaintiff's complaint, Mr. Goerlich's unit was located

in the East building of the IRS campus.  (See Brown Dec. at ¶ 30.)  Plaintiff was assigned to the

same cubicle the entire time that she worked for Mr. Goerlich.  (Moore Dep. at 75.)  Her cubicle

was along the back wall of the building, on the opposite side of the building from Mr. Goerlich's

office, which was an oversized cubicle along the front wall.  (Moore Dep. at 77.)

Through most of 2004, the permanent Lead in Mr. Goerlich's unit was Steve Aluag.

(Moore Dep. at 64, 77.  See also Brown Dec. ¶ 7.)  As with all Leads, when Mr. Aluag was out of

the office or filling in for Mr. Goerlich as Manager, other CSRs would fill in as acting Lead and

be paid a higher wage during the duration of the temporary appointment.  (Moore Dep. at 78-80;

Brown Dec. ¶ 6.)  Plaintiff functioned as an acting Lead for Mr. Aluag on at least three occasions

prior to December 2004.  (Moore Dep. at 104.)

At some point before Christmas 2004, it was announced at a meeting that Mr. Aluag got a

position as a Manager of the unit next to Mr. Goerlich's unit.  (Moore Dep. at 106-09.)  Record

evidence indicates that Mr. Aluag was away from Mr. Goerlich's unit on a special project from

late December 2004 through mid-April 2005. (Brown Dec. ¶ 7.) However, at the time of Mr. Aluag's special project, Plaintiff understood that Mr. Aluag had been given a permanent Manager position. (Moore Dep. at 107.) Upon Mr. Aluag's reassignment, Mr. Goerlich told his unit that he would be looking for a Lead to replace Mr. Aluag and that he would like to select someone from his unit. (Moore Dep. at 110.) Plaintiff heard from Mr. Aluag that Mr. Goerlich was deciding between her and another CSR, Debbie Weldon. (Moore Dep. at 112.) In the meantime, several CSRs, including Plaintiff and Ms. Weldon, were rotating as acting Lead in Mr. Aluag's absence. (Moore Dep. at 112-14.)

Rumors began to circulate that Ms. Weldon had been selected to be the Lead for the unit, and sometime before New Year's 2005, Ms. Weldon confirmed that selection. (Moore Dep. at 123-26.) Plaintiff understood that Ms. Weldon had been selected to be the permanent lead of the unit. (Moore Dep. at 126-27.) A promotion to permanent lead would include a salary increase. (Moore Dep. at 132-33.)

In late December 2004, the day after Plaintiff learned that Ms. Weldon had gotten the Lead position, Plaintiff went to talk to Mr. Goerlich about the Lead position and whom he had chosen. (Moore Dep. at 133, 159.) Mr. Goerlich confirmed that Ms. Weldon had gotten the job and said his decision between Plaintiff and Ms. Weldon had been difficult. (Moore Dep. at 136, 159.) Plaintiff asked Mr. Goerlich what he had based his decision on and whether there was something that she could improve. (Moore Dep. at 159.) Mr. Goerlich told Plaintiff that he could work more closely with Ms. Weldon and "get what he needed." (Moore Dep. at 159.) He leaned back in his chair, put his hands behind his head, raised his hips, spread his legs, smiled, and told Plaintiff that he would give her a second chance to prove to him that she could "give

him what he needed." (Moore Dep. at 159-60, 166-70.) Plaintiff perceived his actions to be a sexual advance, responded that she would not do what he wanted her to do, and walked out of Mr. Goerlich's cubicle. (Moore Dep. at 160, 167-71, 305-06.) As Plaintiff walked away, Mr. Goerlich called her name and asked, "Do you know how many people I've fired?" (Moore Dep. at 204-05.)

Prior to that incident, Plaintiff had a strictly professional relationship with Mr. Goerlich, and he had never made any sexual comments or advances. (Moore Dep. at 177-78.)

That day, Plaintiff reported the incident to one of her coworkers and finished working. (Moore Dep. at 207-11.) She did not report the incident to anyone else that day. (Moore Dep. at 212.)

The next morning, Plaintiff went to Mr. Goerlich's cubicle and asked him for a transfer out of his unit. (Moore Dep. at 212-13.) She told him that she was uncomfortable with the situation he had created, and that she could not work for him any longer. (Moore Dep. at 213.) Mr. Goerlich again asked Plaintiff if she knew how many people he had fired. (Moore Dep. at 214.) She left his office. (Moore Dep. at 214.) Later that day, she told Joe Connor, the CSR in the cubical next to hers, that she had requested a transfer out of Mr. Goerlich's unit, but she did not tell Mr. Connor why. (Moore Dep. at 214-15.) About a week later, Plaintiff again went to Mr. Goerlich's cubicle, requested a transfer, and walked away. (Moore Dep. at 236; Moore Dep. II at 131.) As she was leaving, Mr. Goerlich again asked if she knew how many people he had fired. (Moore Dep. at 236-37.)

Plaintiff continued to work in Mr. Goerlich's unit through late January 2005. (Moore Dep. at 219; 238-39.) On three or four occasions after the incident in his cubicle, Mr. Goerlich

came into Plaintiff's cubicle and sat down on her desk with his legs wide open. (Moore Dep. at 219-22, 225-26.) He would not say anything, but he would sit and watch her work for ten or fifteen minutes at a time. (Moore Dep. at 221.) He never did that before the conversation about the Lead position. (Moore Dep. at 220.) The first time he did this, Plaintiff put the taxpayer with whom she was speaking on hold and asked Mr. Goerlich if he needed her. (Moore Dep. at 228.) He said no and continued to sit there for ten or fifteen minutes while Plaintiff talked to taxpayers on the telephone. (Moore Dep. at 228.) She did not get up and leave her cubicle, (Moore Dep. at 232.) She was scared of Mr. Goerlich at the time. (Moore Dep. at 229.)

On the subsequent occasions that Mr. Goerlich sat at Plaintiff's desk, she did not speak to him at all. (Moore Dep. at 232.) She only knows of one person who witnessed Mr. Goerlich sitting on the desk at her cubicle: her sister, Nancy Ellingsworth, who was a CSR in another unit at the IRS, once witnessed the event and told Plaintiff that he was sitting with his legs open. (Moore Dep. at 223-27, 234-35.)[1] Plaintiff did not tell anyone else at the IRS about the behavior until after her return from medical leave in March 2005. (Moore Dep. at 234.) She did not go to the union about Mr. Goerlich's behavior because she was scared of him and thought he would get her fired. (Moore Dep. at 240.)

On January 25, 2005, Plaintiff slipped on black ice in the IRS parking lot on her way to work. (Moore Dep. at 240-41, 244, Moore Dep. II at 137.) The next day, she had trouble breathing and was taken to the hospital where she was diagnosed with pleurisy. (Moore Dep. at 246-48.) The day after that, her family physician, Dr. Hoffman, diagnosed her with a fractured

---

[1] Ms. Ellingsworth testified that she did not recall Mr. Goerlich sitting on the desk in Plaintiff's cubicle or engaging in any inappropriate or sexually harassing behavior. (Defs.' Mem., Ex. D, Nancy Ellingsworth Deposition, Jan. 7, 2008, at 75, 77-79.)

rib. (Moore Dep. at 253-54.)  She called Mr. Goerlich and asked him for worker's compensation

forms. (Moore Dep. at 255.)  She asked him if her husband could go to her workplace to pick up

forms, and Mr. Goerlich said no. (Moore Dep. at 255-56.)   Plaintiff and Mr. Goerlich agreed

that he would mail her the forms. (Moore Dep. at 255-56.)  She received the forms and a letter

from Mr. Goerlich at the end of the first week of February. (Moore Dep. at 257.)[2]  She later

returned the completed forms to him at the office. (Moore Dep. at 260-61.)  He had informed her

that he would submit the forms. (Goerlich Mem.)

After her injury in January 2005, Plaintiff did not return to work until March 14, 2005.

(Moore Dep. at 255, 262.  See also Defs.' Mem., Ex. G, Moore Performance Appraisal Form,

2005 (signed and dated by Plaintiff on March 14, 2005).)  Upon her return, she went to see Mr.

Goerlich, who told her that he had some papers for her to sign. (Moore Dep. at 266, 279.)

Plaintiff asked him to discuss her worker's compensation pay, and he said, "Don't count on it,"

and threw onto the table a piece of paper on which was written the name and telephone number

of Ms. Troy Billups, a worker's compensation representative. (Moore Dep. at 266-67, 279.)  He

said not all the forms had been sent in, so she might not get worker's compensation benefits.

(Moore Dep. at 267.)  On some later date, Plaintiff called Ms. Billups, who told her that her

worker's compensation package was incomplete because there was no doctor's certification.

(Moore Dep. at 268-69, 280-81.)  Plaintiff told Ms. Billups that the doctor's certification had

been included in the package she had given Mr. Goerlich, and Ms. Billups replied that the

---

[2] The letter from Mr. Goerlich was dated February 1, 2005. (Defs.' Mem., Ex. E,
Goerlich Mem. to Moore, Feb. 1, 2004 ("Goerlich Mem.").)  Presumably, the year should read
2004. The letter also states, "Everyone here is concerned about your muscle tear.  We were all
thankful that it was not pleurisy as first suspected." (Goerlich Mem.)

certification had not been received with the package. (Moore Dep. at 269.)[3] Plaintiff faxed the

doctor's certification to Ms. Billups that day. (Moore Dep. at 271-72.) Her request for worker's

compensation benefits was approved, and she received worker's compensation benefits for the

entire period she was out of work. (Moore Dep. at 272-73; Defs.' Mem., Ex. Q, Dept. of Labor

Letter to Moore, Mar. 22, 2005.)

During Plaintiff's March 14, 2005, meeting with Mr. Goerlich, the two of them went over

a variety of papers related to her leave and her annual evaluation. (Moore Dep. at 282.)

Sometime in late 2004, Mr. Goerlich had complimented Plaintiff on her job skills and told her

she was going to get an increase on her annual evaluation in 2005, and that her scores would be

4's and 5's. (Moore Dep. at 173-75.) When she received her evaluation on March 14, 2005, her

overall score had decreased to 3.6 from her prior year's score of 3.8. (Defs.' Mem., Ex. F, Moore

Performance Appraisal Form, 2003-2004; Defs.' Mem., Ex. G, Moore Performance Appraisal

Form, 2004-2005.) Plaintiff signed off on the evaluation form but told Mr. Goerlich that she had

"had enough" with the way he was handling things and that she was going to see Joann Brown,

who at the time was the Department Manager who supervised all of the PPS units. (Moore Dep.

at 282-83; Brown Dec. ¶ 2.) Plaintiff told Ms. Brown that Mr. Goerlich was sexually harassing

her, related some of the incidents that had occurred, and asked if her transfer request would be

approved. (Moore Dep. at 234, 285-87.)[4] Before Plaintiff could explain the details of what had

occurred, Ms. Brown made excuses for Mr. Goerlich, stating, for example, that he was only

---

[3] At some point Plaintiff received a letter from the Department of Labor, dated March 14, 2004, stating that her workers' compensation claim was incomplete without a physician's report. (Moore Dep. at 266; Defs.' Mem. Ex. P, Dept. of Labor Letter to Moore, Mar. 14, 2005.)

[4] At that point, Plaintiff did not tell Ms. Brown about Mr. Goerlich sitting on her desk. (Moore Dep. at 287.)

boasting. (Moore Dep. at 289.) Ms. Brown said she knew nothing about a transfer request, and she told Plaintiff to go home and calm down and that she would take care of the situation. (Moore Dep. at 285-86.)

The next day, on March 15, 2005, Ms. Brown asked Plaintiff to explain again what Mr. Goerlich had done. (Moore Dep. at 289.) She told Plaintiff that she had instructed Mr. Goerlich not to go near her or talk to her, and that Plaintiff had been transferred out of his unit. (Moore Dep. at 289-90.) She said that Plaintiff would sit at the same desk but that her supervisor would be Mary Selanitis. (Moore Dep. at 290.)

Later that day, Mr. Goerlich blocked Plaintiff's path in the hallway as she was returning to her cubicle from the fax machine. (Moore Dep. at 180-85, 290.) She turned and took another path to her cubicle to avoid him. (Moore Dep. at 180-85.) The next day, on March 16, 2005, she reported the Goerlich situation to the union and the IRS's Equal Employment Opportunity Office ("EEO"). (Moore Dep. at 185-86, 291-92; Pl.'s Opp'n, Ex. J, EEO Counseling Report ("EEO Counseling Report", Part I) (stating that Plaintiff first sought counseling on March 16, 2005, for sexual harassment).) The union told her they would get her out of the building. (Moore Dep. at 295.) Plaintiff then returned to Ms. Brown, who said Plaintiff would go to a unit managed by Ginny Morrison. (Moore Dep. at 294.) Plaintiff reported to Ms. Morrison's unit in the southwest building that day. (Moore Dep. at 296.)

Later in 2005, during an IRS reorganization, Ms. Morrison's unit, including Plaintiff, was moved into the east building. (Moore Dep. at 296-97, 300.) Previously, all the PPS units except Mr. Goerlich's unit were in the East Building, thus, when space became available in the East Building, IRS management moved Ms. Morrison's unit in order to consolidate all the PPS units

into a single building. (Brown Dec. at ¶¶ 30-32.) At that time, Ms. Morrison alerted the branch chief of the situation between Plaintiff and Mr. Goerlich. (Moore Dep. at 299-300.)

On more than three occasions after Plaintiff had returned to the East Building, Mr. Goerlich stopped in the aisles to stand and stare at Plaintiff. (Moore Dep. at 193, 303-04.) He never spoke with Plaintiff after she was transferred out of his unit. (Moore Dep. at 304.) Plaintiff got upset when she would find herself in the same room as him. (Moore Dep. at 305.)

Plaintiff asked the EEO if she could be transferred to another department to be kept away from Mr. Goerlich, but the EEO representative said she did not think that was possible. (Moore Dep. at 306-07.) No one told Plaintiff that she could take a different job in a different building. (Moore Dep. at 301-02.)

Plaintiff filed a grievance about her performance appraisal score and an EEO complaint of sexual harassment by Mr. Goerlich. (Moore Dep. at 308, 310-14.) Following a grievance proceeding, her 2005 performance appraisal score was increased, and later that year she received a bonus based on her increased score. (Moore Dep. at 314-15.) After her score was raised, she withdrew the portion of her EEO claim regarding her performance appraisal score. (Defs.' Mem., Ex. H, Partial Withdrawal Statement, Aug. 24, 2005.)

## PROCEDURAL HISTORY

Plaintiff requested counseling with the IRS' EEO counselor on March 16, 2005. (EEO Counseling Report, Part I.) On March 21, 2005, she had her initial interview with the counselor and was advised of her rights under the federal sector Equal Employment Opportunity Regulations. (EEO Counseling Report, Notice of Rights and Responsibilities.) On April 19,

2005, Plaintiff filed her formal discrimination complaint with the Department of the Treasury. (Pl.'s Opp'n, Ex. J, Individual Complaint of Employment Discrimination, Apr. 19, 2005.) No determination was made within one hundred eighty (180) days. (Compl. ¶ 43.) She filed the suit in this court on October 26, 2006.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. Anderson, 477 U.S. at 248.

"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade [the court] that, even if all of the inferences which could reasonably be drawn from the evidentiary materials of

record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in

the plaintiff's favor." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008)

(citations omitted).  In reviewing a motion for summary judgment, the court "does not make

credibility determinations and must view facts and inferences in the light most favorable to the

party opposing the motion." Seigel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127

(3d Cir. 1995).


## DISCUSSION

### I.      Plaintiff's Quid Pro Quo Claim

The decisional law in the Third Circuit is clear about what constitutes quid pro quo sexual

harassment:

> [U]nwelcome sexual advances, requests for sexual favors, and
> other verbal or physical conduct of a sexual nature constitute quid
> pro quo sexual harassment when (1) submission to such conduct is
> made either explicitly or implicitly a term or condition of an
> individual's employment or (2) submission to or rejection of such
> conduct by an individual is used as the basis for employment
> decisions affecting such individual.

Bonenberger v. Plymouth Tp., 132 F.3d 20, 27 (3d Cir. 1997) (quoting Robinson v. City of

Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997), overruled in part on other grounds by Burlington

Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  See also Hurley v. Atlantic City

Police Dept., 174 F.3d 95, 133(3d Cir. 1999) (Cowan, J., concurring) ("[T]o prove a claim of

quid pro quo sexual harassment, a plaintiff must demonstrate either that she submitted to the

sexual advances of her alleged harasser or suffered a tangible employment action as a result of

her refusal to submit to those sexual advances.") (citations omitted); id. (interpreting Burlington

Page 11 of  29

Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), as holding that "cases . . . which involve only
unfilled threats and no tangible employment action, are properly categorized as hostile work
environment claims, not quid pro quo claims."). "A tangible employment action constitutes a
significant change in employment status, such as hiring, firing, failing to promote, reassignment
with significantly different responsibilities, or a decision causing a significant change in
benefits." Ellerth, 524 U.S. at 761.

Here, Plaintiff presents evidence that her supervisor made a sexual advance toward her
and that she refused that advance, but her claim of quid pro quo harassment must fail because she
cannot show that she suffered a tangible employment action as a result of her refusal. Plaintiff
presents evidence that Mr. Goerlich repeatedly asked her if she knew how many people he had
fired. She interpreted this as a threat to fire her. Even assuming Mr. Goerlich's comments were
threats to fire Plaintiff as a result of her refusal to submit to his sexual advance, the threats cannot
support a quid pro quo sexual harassment claim because they do not constitute a tangible
employment action. See Ellerth, 524 U.S. at 754 ("[b]ecause [the plaintiff's] claim involves only
unfulfilled threats, it should be categorized as a hostile work environment claim which requires a
showing of severe or pervasive conduct."); Hurley, 174 F.3d at 133 (Cowan, J., concurring)
("cases such as Ellerth, which involve only unfilled threats and no tangible employment action,
are properly categorized as hostile work environment claims, not quid pro quo claims").

Plaintiff also contends that Mr. Goerlich physically intimidated her and that the
intimidation adversely affected the terms and conditions of her employment. She claims that Mr.
Goerlich blocked her in the aisles of their building and sat at her desk to stare at her and make
her uncomfortable. (Pl.'s Opp'n at 12-13.) These actions, too, do not meet the Supreme Court's

definition of tangible employment actions.  See Ellerth, 524 U.S. at 761.

Finally, Plaintiff claims that she suffered a tangible employment action when Mr. Goerlich allegedly delayed the filing and processing of her worker's compensation documents, "which materially changed her working conditions because it resulted in her not getting paid her salary." (Pl.'s Opp'n at 13.)  The court finds this allegation to be too tenuous to support a quid pro quo claim.  Plaintiff has no evidence that Mr. Goerlich intentionally delayed the processing of her worker's compensation claim.  She points only to her own speculation, based on the fact that a doctor's certification was not included in the materials Mr. Goerlich forwarded to the claims processor.  (Moore Dep. at 260-73.)  Even if this were sufficient evidence for a reasonable factfinder to conclude that Mr. Goerlich intentionally delayed Plaintiff's claim for benefits, Plaintiff still cannot demonstrate she was subject to an adverse employment action.  She admits that she her claim form was timely submitted by Mr. Goerlich, although without the doctor's certificate; that, because the claim was received, she was given the opportunity to provide the doctor's certificate; and that upon its receipt her claim was resolved quickly to her satisfaction.  (Moore Dep. at 271-73.)  She admits that she received workers's compensation benefits for the entire time period during which she was out of work.  (Moore Dep. at 273.)[5]

---

[5] Because the court finds Plaintiff was not subject to a tangible adverse employment action, the court does not address whether Plaintiff's quid pro quo sexual harassment claim is time-barred pursuant to Equal Employment Opportunity regulations for federal employees, which provides that employees of federal agencies "who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a[n Equal Employment Opportunity] Counselor prior to filing a complaint in order to try to informally resolve the matter" and that initial contact must occur "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105.

## II.     Plaintiff's Hostile Work Environment Claim

### A.     Plaintiff's Hostile Work Environment Claim is not Time Barred.

Defendants claim that Plaintiff's Title VII claims are barred by her failure to seek EEOC counseling within 45 days of Mr. Goerlich's alleged sexual advance.  The relevant regulation provides that aggrieved federal employees must proceed as follows:

> a) Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
>
> (1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.
>
> (2) The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105 (emphasis added); Moss v. Potter, 2007 WL 2900551, *2 (3rd Cir., Oct. 3, 2007).  Unless waived by the aggrieved person, the EEO counselor must conduct the final interview with the person within 30 days of the person's initial request for counseling and must inform the person of the right to file a formal discrimination complaint with the EEOC via her agency employer.  29 C.F.R. § 1614.105(d); 29 C.F.R. § 1614.106(b); Moss v. Potter, 2007 WL 2900551, *2.  An employee may commence a civil action in the district court if there has been no EEOC final decision within 180 days of her formal complaint.  29 C.F.R. § 1614.407(d).

Time limits made applicable to Title VII causes of action are not jurisdictional, <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982); <u>Robinson v. Dalton</u>, 107 F.3d 1018, 1021 (3d Cir. 1997). Here, the 45-day time limit is but a prudential exhaustion requirement, which is aimed at respecting agency autonomy by allowing it to correct its own errors. <u>Wilson v. MVM, Inc.</u>, 475 F.3d 166, 174 (3d Cir. 2007) (citations omitted). Therefore, the time limit is subject to the equitable doctrines of waiver, estoppel, and tolling. <u>See Robinson</u>, 1021-22. "However, merely because exhaustion requirements are prudential does not mean that they are without teeth. Even prudential exhaustion requirements will be excused in only a narrow set of circumstances." <u>Wilson</u>, 475 F.3d at 175.

As of yet, no precedential third circuit opinion has addressed the issue of equitable waiver of the 45 day time limit set forth in Section 1614.105. The court's unpublished opinions suggest that equitable tolling of the time limit should be granted sparingly. <u>See, e.g., Hare v. Potter</u>, 220 Fed. Appx. 120 (3d Cir. 2007), (declining to equitably toll a federal employee's sexual harassment claim where the employee had not sought EEO counseling within 45 days, and citing the circuit's equitable tolling standards as stated in <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1387 (3d Cir.1994)); <u>Shenkan v. Potter</u>, 71 Fed. Appx. 893, 896 n. 4 (3d Cir. 2003) (stating that employee's claim should not be equitably tolled because there was no evidence that the federal employer actively misled him or extraordinarily prevented him from asserting his rights). However, in other unpublished opinions, third circuit panels have held that federal agencies must give employees notice of the 45-day time limit to see EEO counseling. <u>See generally Hatcher v. Potter</u>, 196 Fed. Appx. 120 (3d Cir. 2006) (discussing the district court's review of whether the employee had been provided with notice of the forty-five day time limit as

required by 29 C.F.R. § 1614.102(b)(5)); Shenkan, 71 Fed. Appx. at 896 ("Shenkan has never come forth with any evidence that he was "not otherwise aware" of the relevant limitations periods, as required by 29 C.F.R. § 1614.105 (a)(2)."). Another third circuit panel has held in an unpublished opinion that a plaintiff need only contact an EEO counselor within 45 days of one act of discrimination where there is a continuing violation. See Hatcher v. Potter, 196 Fed. Appx. 120, 121 (3d Cir. 2006) (stating the plaintiff sought EEO counseling fifty-one days after the last alleged incident of discrimination).

Plaintiff concedes that she did not seek counseling within 45 days of Mr. Goerlich's alleged sexual advance, (Pl.'s Opp'n at 24), but she has submitted an affidavit wherein she asserts that she was never told of the 45-day time limit and was not otherwise aware of its existence, (Pl.'s Opp'n, Ex. G, Moore Aff., Feb. 18, 2008). Plaintiff also points to evidence that neither the IRS sexual harassment policy flier posted at her workplace nor the computer-based briefing that IRS employees are required to read inform the reader of the 45-day time limit. (Pl.'s Opp'n at 25; Policy Flier; Pl.'s Opp'n, Ex. I, IRS Prevention of Sexual Harassment Website.)

On May 8, 2005, Cheryl Vuilleumier, an EEO Specialist, wrote to Plaintiff in regard to her April 19, 2005, formal complaint of discrimination. (Defs.' Reply, Ex. R, Letter from Dept. of the Treasury to Moore, May 8, 2005 ("Treasury Letter").) Ms. Vuilleumier referred to the 45-day time limit and wrote,

> After careful review of the complaint, the EEO Counseling Report and your email of May 2, 2005, I find that there may be claims attached to your formal complaint that appear to not have been addressed in EEO counseling in a timely manner. Therefore, this letter provides an opportunity for you to explain why counseling may not have been timely sought regarding several of the claims addressed with the formal complaint.

(Id.) Ms. Vuilleumier told Plaintiff she needed to respond in writing within 15 days, stating the exact dates of Mr. Goerlich's alleged sexual advance and threats to fire her, as well as the dates of her attempts to obtain worker's compensation benefits. (Id.) She further wrote that, upon Plaintiff's failure to respond or to address the aforementioned questions, "the complaint may be dismissed for failure to comply with the applicable time limits." (Id.)

There is no evidence of record that Plaintiff responded to Ms. Vuilleumier's request for detailed information, but Defendants admit that "Plaintiff's Complaint was eventually accepted for investigation." (Defs.' Reply at 8-9, n.7.) They contend, however, that no final administrative decision was made on the issue of the 45-day time limit because Plaintiff elected to file suit in this court before any agency-level decision was made, and that Defendants never waived their right to argue the issue. (Id.)

The Department of Treasury clearly had the option of dismissing Plaintiff's complaint for failure to timely contact an EEO counselor. See Hatcher, 196 Fed. at 121 ("Hatcher's EEO complaint was dismissed pursuant to 29 C.F.R. § 1614.107(a)(2) for failure to timely contact an EEO counselor."). It did not do so within 180 days of her filing. There is no evidence in the record that the Department of Treasury rejected any portion of Plaintiff's complaint as untimely at any stage of the administrative process.[6] The Department of Treasury instead opted to investigate Plaintiff's Complaint. Additionally, by her affidavit, Plaintiff has met her summary judgment burden of presenting evidence to this court that she was not notified of the 45-day time limit and was not otherwise aware of it, and Defendants have presented no evidence to the

---

[6] The court notes that Plaintiff's EEO counselor left blank the portion of the EEO Counseling Form that asks, "If complaint appears to be untimely, what explanation is offered to explain why Counselor was not contacted in 45 days?" (EEO Counseling Report, Part I, Item 12.)

contrary. There is no record evidence that Plaintiff demonstrated her of lack of notification and awareness to the Department of Treasury, but the regulation regarding waiver is phrased as mandatory: the agency "shall extend the 45-day time limit" when presented with evidence such as that which is now before this court. 29 C.F.R. § 1614.105(a)(2) (emphasis added). Therefore, under the circumstances presented, the court finds that the Department of Treasury would have been required to waive the 45-day time limit for Plaintiff's claims, even without a finding of a continuing violation.

B.   Plaintiff Has Established a Prima Facie Case of Hostile Work Environment

To establish a prima facie of hostile work environment sexual harassment, a plaintiff must demonstrate five elements:

(1)   she suffered intentional discrimination because of her sex;

(2)   the discrimination was severe or pervasive;

(3)   the discrimination detrimentally affected her;

(4)   the discrimination would have detrimentally affected a reasonable person in like circumstances; and

(5)   a basis for employer liability is present.

See Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). In the third circuit, the same framework applies to hostile work environment claims arising from the actions of a co-worker. Weston, 251 F.3d at 426 (citations omitted). A plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 252-53; McDonnell Douglas, 411

U.S. at 802.

The hostile work environment inquiry is both objective and subjective. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21-22.

To determine whether an environment is hostile or abusive, a court "must look at numerous factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Weston, 251 F.3d at 426 (citations omitted). "[C]ourts should not consider each incident of harassment in isolation. Rather, a court must evaluate the sum total of abuse over time." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir.1999) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)). See also Marra, 497 F.3d at 303 (holding that it does not matter "whether each piece of evidence of antagonistic conduct is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively." ); Woodson v. Scott Paper, 109 F.3d 913, 921 (1997) (holding that the court "must determine whether the evidence is sufficient based on the whole picture.").

Insofar as Plaintiff's claims that Mr. Goerlich made sexual advances toward her, the conduct was sex-based. Durham Life Ins., 166 F.3d 139, 148 (3d Cir. 1999) ("We generally presume that sexual advances . . . are sex-based."). Thus, Plaintiff satisfies the first element of

the inquiry.

The court must consider the totality of the circumstances to decide the second element of the hostile work environment inquiry: whether a plaintiff has presented evidence that an alleged hostile working environment was severe or pervasive.  Andrews, 895 F.2d at 1482.  In addition to overt sex discrimination, the court may consider non-sexual and facially neutral mistreatment that contributes to a hostile work environment.  Durham Life Ins., 166 F.3d at 148; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).

Taking all facts in the light most favorable to Plaintiff, the record shows that there exists a genuine issue of material fact as to whether the alleged sexual harassment by Mr. Goerlich was sufficiently severe or pervasive as to constitute a Title VII violation.  Plaintiff has presented evidence that Mr. Goerlich made a sexual advance toward her in December 2004 and that he threatened to fire her on at least two subsequent occasions.  She has also presented evidence that he attempted to intimidate her by blocking her path in the aisles of the workplace and by sitting at her desk for ten to fifteen minute periods of time, watching her without speaking.  A reasonable factfinder could determine that Mr. Goerlich's conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.  See Harris, 510 U.S. at 21.

Considering the third element of the hostile work environment claim, Plaintiff has presented evidence that Mr. Goerlich's conduct detrimentally affected her.  She testified in her deposition that she was upset by Mr. Goerlich's behavior and that she was scared that he might cause her to be fired.  (See, e.g., Moore Dep. at 182, 229, 240.)[7]

---

[7] The court reaches this conclusion without factoring in Plaintiff's lowered performance appraisal score, which Plaintiff withdrew from her EEO complaint and for which Defendants have provided a legitimate non-discriminatory reason.  (See Brown Dec. at ¶¶ 24-29 (stating that Ms. Brown decided to lower Ms. Moore's performance appraisal score before Ms. Brown was

As to the fourth element of the hostile work environment inquiry, the court finds that a reasonable factfinder could find that Mr. Goerlich's alleged conduct would, if true, detrimentally affect a reasonable person in Plaintiff's circumstances.

Finally, the court turns to the question of whether there is a triable factual basis for employer liability. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998). It is undisputed that Mr. Goerlich was Plaintiff's supervisor at the time of his alleged sexual advance and through mid-March 2005. Thus, Plaintiff satisfies the fifth element of a prima facie case.

<u>C.</u>     <u>Defendants May Assert an Affirmative Defense.</u>

Because Plaintiff has made out a prima facie case of hostile work environment, the court must determine whether Defendants may assert an affirmative defense. Generally, hostile work environment claims attributable to a supervisor fall into two categories:

(1)     harassment that culminates in a tangible employment action, for which employers are strictly liable; and

(2)     harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense.

<u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 143 (2004) (citing <u>Burlington Industries, Inc.</u> <u>v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 808 (1998)).

The court has determined that Plaintiff was not subject to a tangible employment action. Thus, an affirmative defense is available to Defendants.

---

aware of Plaintiff's sexual harassment allegations).)

**D.**     Defendants Fail to Establish the Ellerth/Faragher Affirmative Defense.

The Supreme Court has summarized the Ellerth/Faragher affirmative defense as follows:

> An employer may defend against [a hostile work environment]
> claim by showing both (1) that it had installed a readily accessible
> and effective policy for reporting and resolving complaints of
> sexual harassment, and (2) that the plaintiff unreasonably failed to
> avail herself of that employer-provided preventive or remedial
> apparatus.

Suders, 542 U.S. at 134.  The first element of the affirmative defense looks beyond the mere

presence or absence of a sexual harassment policy.  The Court has also held that, as the first

element of the affirmative defense, the employer must demonstrate that it "exercised reasonable

care to prevent and correct promptly any sexually harassing behavior." Ellerth, 524 U.S. at 765.

The burden to establish the affirmative defense by a preponderance of the evidence falls on the

employer. Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

       1.     *Defendants' Response to Plaintiff's Complaints.*

It is undisputed that, at the time of the events alleged in Plaintiff's Complaint, Defendants

had a policy that the workplace was to be free from sexual harassment.  (See Brown Dec. at ¶ 15-

16; Brown Dec., Ex. 2, IRS Policy Against Sexual Harassment, IRS Doc. No. 7591, Revised

May 2001 ("Policy Flier").)  A one-page flier summarizing the policy was posted in public areas

where IRS employees work.  (Brown Dec. at ¶ 17.)  That flier itself does not instruct employees

how to report complaints of sexual harassment, but it does provide a toll-free telephone number

for the IRS Sexual Harassment Hotline and instructs the reader to address questions to the local

EEO Officer, EEO Counselor, or supervisor.  (See Policy Flier.)  In addition, a memorandum

about the sexual harassment policy was distributed to all IRS employees on May 14, 1999.

(Brown Dec., Ex. 3, IRS Mem., Policy Against Sexual Harassment, May 14, 1999 ("Policy

Memorandum").)  According to the memorandum,

> Any employee . . . who believes that he or she has been subjected
> to sexual harassment should report such behavior immediately to a
> supervisor or a higher level official.  All allegations of sexual
> harassment will be dealt with promptly and impartially, and
> employees will not suffer any form of reprisal or retaliation. . . . .

(Policy Memorandum at 2.)  The memorandum also provides the telephone number for the IRS

sexual harassment hotline.  (Policy Memorandum at 2.)

Plaintiff participated in mandatory briefings about sexual harassment once a year at the

IRS.  (Moore Dep. at 319-20.  See also Brown Dec. at ¶ 18.)  She had such briefings before the

events with Mr. Goerlich began.[8]  (Moore Dep. at 320.)  Plaintiff knew from the briefings that

she was supposed to report instances of sexual harassment, but she claims she was scared to

report Mr. Goerlich for fear that he would fire her in retaliation. (Moore Dep. at 320-21.)

Plaintiff does not dispute the existence of the IRS anti-discrimination policy, but she

contends that it was administered ineffectively.  (Pl.'s Opp'n at 22.)  Plaintiff contends that IRS

personnel did not take her complaints about sexual harassment seriously and that managers and

supervisors disregarded their responsibilities under the IRS sexual harassment policy.  (Pl.'s

Opp'n at 21.)  Specifically, she provides evidence that managers who receive complaints of

sexual harassment must pass on the complaint to the EEO.  (Pl.'s Opp'n at 22; Pl.'s Opp'n, Ex.

B, Joann M. Brown Dep. ("Brown Dep.") at 28-29.)  She reported sexual harassment by Mr.

Goerlich to Ms. Brown on March 14, 2005, when she received her annual evaluation.  (Moore

Dep. at 234, 282-83, 285-87.)  Ms. Brown testified in her deposition on December 7, 2007, that

she had never reported a complaint of sexual harassment to the EEO.  (Brown Dep. at 29.)  Thus,

---

[8] Defendants do not allege that the briefings informed Plaintiff of the 45-day time limit.

she never reported Plaintiff's complaint to the EEO.   Instead, upon hearing Plaintiff's complaint on March 14, 2005, Ms. Brown sent Plaintiff home to calm down.  (Moore Dep. at 286-88.)  On March 15, 2005, when Plaintiff returned to work, Ms. Brown assigned Plaintiff to a different supervisor, left her at the same desk, and told Mr. Goerlich not to have any contact with Plaintiff.  (Moore Dep. at 289-90.)  On March 16, 2005, Plaintiff went to the union and the EEO on her own initiative.  (Moore Dep. at 291-92.)  Upon bringing EEO papers to Ms. Brown, Plaintiff was transferred to another building.  (Moore Dep. at 293-97.)  The EEO office contacted Ms. Brown on March 16, after hearing from Plaintiff.  (Brown Dep. at 56-57.)

Viewing the facts in the light most favorable to Plaintiff, the court cannot conclude that Defendants "exercised reasonable care to prevent and correct promptly any sexually harassing behavior."  Ellerth, 524 U.S. at 765.  Ms. Brown did not promptly contact the EEO about Plaintiff's complaint.  A reasonable factfinder could conclude that Ms. Brown's actions between March 14 and March 16 were not an exercise of reasonable care and were in technical violation of Defendants' own sexual harassment policy.  Defendants fail to establish the first element of the Ellerth/Faragher affirmative defense by the preponderance of the evidence.  Thus, the court cannot grant summary judgment to Defendants on Plaintiff's hostile work environment claim.

       2.     *Whether Plaintiff Availed Herself of Her Employer's Remedial Apparatus*

Alternatively, the court briefly addresses the second element of the affirmative defense. Here, too, Defendants have failed to establish that Plaintiff unreasonably failed to avail herself of the employer-provided remedial apparatus.  The court finds that Plaintiff has presented some evidence that Mr. Goerlich's behavior before, during, and after her medical leave constitutes a continuing violation.  Cf. Shenkan v. Potter, 71 Fed. Appx. 893, 894 (3d Cir. 2003) (noting that

the Postal Service dismissed a formal administrative complaint for failure to meet the 45-day

limit but the EEOC reversed because the claims fell within the continuing violations doctrine

exception).  Furthermore, the court has found that the Department of Treasury would waive

Plaintiff's failure to seek EEO counseling within 45 days of Mr. Goerlich's alleged sexual

advance because Plaintiff advances without contradiction that she knew nothing of the time

limitation.  A reasonable factfinder could not conclude that Plaintiff unreasonably failed to avail

herself of the employer-provided remedial apparatus.


**III.    Plaintiff's Retaliation Claim**

Title VII provides as follows:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because he has
> opposed any practice made an unlawful employment practice by
> this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Opposition to discrimination "can take the form of informal protests of

discriminatory employment practices, including making complaints to management." Moore v.

City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (internal quotation and citation omitted).

Under the McDonnell Douglas burden-shifting paradigm, the employee bears the initial

burden of establishing a prima facie case of retaliation under Title VII. See McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  The employee must prove that (1) she engaged in a

protected employment activity under Title VII; (2) her employer took an adverse employment

action after or contemporaneous with the protected activity; and (3) a causal link exists between

the adverse action and the protected activity. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007); Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007). If the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Marra, 497 F.3d at 300 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)). If the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Marra, 497 F.3d at 300 (citations omitted.).

To satisfy the adverse employment action requirement for a prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quotations and citation omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" that often occur in the workplace do not normally constitute materially adverse employment actions. Id. "Context matters" in determining whether a challenged act would have dissuaded a reasonable employee from making or supporting a charge of discrimination, and an "act that would be immaterial in some situations is material in others." Id. at 69 (quotation omitted).

To show a causal connection between the employee's protected activity and the employer's adverse action, a plaintiff may rely on a "broad array of evidence." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). An "unusually suggestive proximity in time

between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection," but "the mere passage of time is not legally conclusive proof against retaliation." Marra, 497 F.3d at 302 (quotations, citations, and alterations omitted). See also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n. 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.")  The Third Circuit has explained:

> Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, . . . or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

Marra, 497 F.3d at 302 (citations omitted).

If a plaintiff has made a prima facie case, and if the employer has responded with legitimate, non-retaliatory reasons for its actions, the plaintiff must next establish pretext.  To establish pretext, the plaintiff must show by a preponderance of the evidence that the employer's articulated reasons are false and that the discrimination or retaliation was the "real reason for the adverse employment action." Marra, 497 F.3d at 300-01 (quotation omitted).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated" or retaliated Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000); Marra, 497 F.3d at 306.  A plaintiff may show pretext by exposing "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Marra, 497 F.3d at 306 (quotation omitted).  It is not enough to show that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer." Fuentes v. Perskie, 32 F.3d at 764.

Here, Plaintiff engaged in protected activity by refusing her immediate supervisor's alleged sexual advance and by reporting her allegations of sexual harassment by Mr. Goerlich to Ms. Brown and the EEO Counselor.  She alleges that Mr. Goerlich subjected her to four adverse employment actions: 1) repeated threats to fire her; 2) repeated physical intimidation; 3) lowering of her performance appraisal; and 4) failure to forward her worker's compensation paperwork. (Pl.'s Opp'n at 19.)

Considering the totality of Plaintiff's allegations, and viewing all facts in the light most favorable to Plaintiff, the court cannot conclude that Plaintiff was not subject to an adverse employment action.  A reasonable factfinder could find that, collectively, Mr. Goerlich's alleged actions – particularly, the alleged acts of intimidation at Plaintiff's desk and in the corridors of the workplace – might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Likewise, the court finds that a reasonable factfinder could find a causal link between the alleged adverse actions and Plaintiff's protected activity.  Plaintiff alleges that Mr. Goerlich immediately threatened to fire her upon her refusal of his alleged sexual advance, and she alleges a pattern of escalating intimidation that continued for months after the first alleged advance.  Thus, the court finds that Plaintiff has established a prima facie case of retaliation.

Defendants have proffered a legitimate non-discriminatory reason why management

moved Plaintiff's unit back into the East Building in November 2005, but that move is not the basis of Plaintiff's retaliation claim. Defendants have presented no legitimate non-discriminatory reasons for Mr. Goerlich's alleged retaliatory acts. Thus, the court denies Defendants' motion for summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied on Plaintiff's retaliation and hostile work environment claims and granted on Plaintiff's quid pro quo claim.

An Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LINDA MOORE,                          :        CIVIL ACTION
                                      :
                 Plaintiff,           :        NO. 06-4808
        v.                            :
                                      :
HENRY M. PAULSEN, JR., and            :
MARK W. EVERSON,                      :
                                      :
                 Defendants.          :

## ORDER

AND NOW, this 15th day of September, 2008, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 19), Plaintiff's Response in opposition thereto (Doc. No. 25), and Defendants' Reply (Doc. No. 31), it is hereby ORDERED as follows:

1.    Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART for the reasons set forth in the attached memorandum..

2.    Defendants' Motion for Summary Judgment on Plaintiff's quid pro quo sexual harassment claim is GRANTED.  Accordingly, judgment is entered in favor of Defendant and against Plaintiff on Count I of Plaintiff's Complaint.

3.    Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment and retaliation claims is DENIED.

BY THE COURT:

JAMES T. GILES        J.